This is a death penalty case. On March 26, 1986, Fred and Evelyn Blackmon were *Page 1277 
robbed, kidnapped, and murdered. Petitioner William Glen Boyd was convicted of committing these crimes and was sentenced to death by electrocution. The Court of Criminal Appeals affirmed.Boyd v. State, 542 So.2d 1247 (Ala.Crim.App. 1988). A complete recitation of the facts of this case is set forth in that court's opinion; we set forth below only such facts as we deem necessary to resolve the issues before us.
On the morning of the crime, Boyd and Robert Milstead[1] parked Boyd's Chevrolet Camaro automobile about a quarter mile from the victims' home. The robbery and kidnaping began at the Blackmons' home and continued in the Blackmons' Cadillac Eldorado automobile; the murder site was a secluded area on the Coosa River near Ohatchee.
Sergeant Hall of the Anniston Police Department testified that on April 3, 1986, as Boyd exited from his Camaro, which was parked on the street in front of his house, he was arrested and charged with kidnaping the Blackmons. Another officer took Boyd into custody, and Sergeant Hall impounded the Camaro and drove it to the city impound lot behind the police station.[2] Later that afternoon, Boyd gave a statement, amounting to a confession, to Lieutenant Carroll. During the course of that statement, at which only Lieutenant Carroll was present, Boyd said that the clothes worn by him and Milstead on the date of the crimes were on the seat of the Camaro.
Officer Bradley and Sergeant Watson testified that they inventoried the Camaro on April 7, 1986, four days after the arrest and impoundment. Bradley testified that "[i]t was an inventory by request of Lieutenant Carroll." Bradley further testified that the detective bureau had asked that the Camaro be inventoried and that evidence found pursuant to the inventory be gathered. Sergeant Watson confirmed that the purpose for entering the Camaro was "[t]o conduct an inventory search of the vehicle." Lieutenant Carroll furnished the key to the Camaro to Sergeant Watson. Carroll had received the key from the arresting officer, who had kept it with him for "three or four days" after the arrest.
Sergeant Watson agreed that the inventory was conducted in "compliance with the policies of the police department." Boyd objected to any further testimony concerning the inventory or its fruits unless proof was made as to what the policies or procedures were; his objection was overruled. During Sergeant Watson's cross-examination, the following exchange occurred:
 "Q. Let's go back to what you've referred to as an inventory search of a vehicle.
 "Would you please tell this Court and this jury what the policy is with the City of Anniston concerning inventory searches?
 "A. Whenever a vehicle is impounded, this vehicle has to be inventoried thoroughly in order to determine and document anything that may be contained therein.
"Q. Do you normally do those inventory searches?
 "A. I haven't in a long time. I did for many years. I make very few arrests nor do I inventory many cars now.
 "Q. When was the last time you inventoried a vehicle other than Glen's car?
"A. I can't tell you, sir. I don't know.
"Q. A year or two?
"A. Possibly."
Sergeant Watson testified that he did not know where in the city's policy regarding inventory procedures the criteria for conducting inventories were located. He did not know where the list compiled as the result of the inventory was located, and no such list was introduced at trial. *Page 1278 
Officer Bradley was also pressed on cross-examination about the city's policies and procedures regarding inventorying impounded automobiles:
 "Q. It's the standard policy of the police department of the City of Anniston to go out and get evidence whenever a car is impounded?
 "A. No. You're always aware that evidence may be found when you're making an inventory.
 "Q. And, of course, you always take a camera with you when you do an inventory?
"A. On some occasions, yes, sir, you do.
"Q. Always?
"A. Not always.
"Q. What percentage of the time?
"A. I beg your pardon?
 "Q. What percentage of the time is a camera used in making an inventory search of a vehicle at the police department of Anniston?
 "A. Usually, when we're aware that there is a major case involved, we will take a camera as routine procedure to document what condition it's in or anything we discover and to aid us in later documenting what was inside the vehicle.
 "Q. Did you do any kind of recording while you were doing this inventory search?
"A. No, sir. That wasn't my job.
"Q. Did anybody?
"A. Yes, sir.
"Q. In whose possession is that recording?
"A. I don't know where the report is."
No other testimony was adduced by either the State or Boyd relating what the inventory procedures of the City of Anniston Police Department were. No directive, general order, or evidence of a municipal code was introduced that would show what the policies were.
Some of the items obtained as the result of the inventory were introduced against Boyd at trial. This evidence included a fabric very similar to or the same as that used to bind the victims; blood-stained clothes worn by Boyd and Milstead on the day of the crimes; and a necklace that had belonged to Evelyn Blackmon.
We take notice that the State prosecuted its case with extensive testimony, nearly unfaltering, almost exclusively directed at the proposition that the warrantless search of Boyd's Camaro was valid as an inventory. Boyd's objections at trial and rulings in response thereto were directed at the validity of the city's inventory policies. The briefs to the Court of Criminal Appeals and to this Court primarily address the propriety of the search as an inventory. Only in passing did the Court of Criminal Appeals suggest that the search could have been valid as a "vehicle search" based on probable cause. In fairness to the parties, this Court ordered briefing on the probable cause issue to supplement the briefs filed on appeal.
In light of the foregoing facts and circumstances, we now turn to the analysis and resolution of this case.
 I.
In South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092,49 L.Ed.2d 1000 (1976), the Supreme Court of the United States was faced squarely with the issue of whether the police practice of inventorying a vehicle lawfully impounded constituted an "unreasonable search" within the meaning of the Fourth Amendment. Chief Justice Burger, writing for the Court, stated that "[t]hese procedures developed in response to three distinct needs: [1] the protection of the owner's property while it remains in police custody; [2] the protection of the police against claims or disputes over lost or stolen property; [3] and the protection of the police from potential danger."428 U.S. at 369, 96 S.Ct. at 3097 (citations omitted). The Court, after finding no suggestion in the record before it that the inventory there involved was a pretext concealing an investigatory motive, concluded that "in following standard police procedures, . . . the conduct of the police was not 'unreasonable' under the *Page 1279 
Fourth Amendment." Id. at 376, 96 S.Ct. at 3100.
In Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738,93 L.Ed.2d 739 (1987), the Supreme Court reiterated the three-part rationale advanced in support of the inventory procedure as stated in Opperman, and concluded that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." 479 U.S. at 374,107 S.Ct. at 742. Moreover, that Court held that the existence of police discretion in the manner of conducting the inventory did not render the inventory constitutionally infirm "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." Id. at 375, 107 S.Ct. at 743. Justice Blackmun, joined by Justices Powell and O'Connor, concurred in order to "underscore the importance of having such inventories conducted only pursuant to standardized police procedures." Id.
at 376, 107 S.Ct. at 744 (Blackmun, J., concurring). Even in dissent, Justice Marshall, joined by Justice Brennan, recognized that "[s]tandardized procedures are necessary to ensure that this narrow exception [to the mandate of the Fourth Amendment] is not improperly used to justify, after the fact, a warrantless investigatory foray."[3] Id. at 381,107 S.Ct. at 746 (Marshall, J., dissenting).
In Wilkinson v. State, 374 So.2d 400 (Ala. 1979), this Court, denying a petition for a writ of certiorari, recognized thatOpperman had created a seventh exception to the warrant requirement of the Fourth Amendment.[4] Since that time, Coloradov. Bertine, supra, has been decided and, along with Opperman, that case has been construed many times by the Court of Criminal Appeals. We believe that the issues of the case now before us, in light of the holdings of Opperman and Bertine and the concerns of those who wrote separately in those cases, invite discussion of two considerations. First, when must an inventory be conducted, with reference to the time of the impoundment, in order to satisfy the purposes for which this exception developed? Second, what constitutes evidence that the police complied with reasonable or standardized police regulations or procedures relating to automobile inventory practices? We address each consideration separately.
 A.
We are unaware of any case, federal or state, that presents the issue of whether a search can be valid as an inventory notwithstanding a four-day lapse of time between the impoundment and the inventory. We are of the opinion that the Fourth Amendment requires that, without a demonstrable justification based upon exigent circumstances other than the mere nature of automobiles, the inventory be conducted either contemporaneously with the impoundment or as soon thereafter as would be safe, practical, and satisfactory in light of the objectives for which this exception to the Fourth Amendment warrant requirement was created. In other words, to be valid, there must be a sufficient temporal proximity between the impoundment and the inventory. When the inventory must be postponed, each passing moment detracts from the full effectuation of the objectives of the inventory, and indeed, disserves those objectives; at some point, the passage of time requires, to uphold the validity of the inventory, proof of some immediate and exigent circumstances (other than the mere nature of automobiles) the attention to which is more important than protecting the arrestee's property and protecting the police from false claims or danger associated with that property.
There is no doubt that an inventory of a vehicle conducted after a lawful impoundment of the vehicle and the arrest of its *Page 1280 
owner or operator is an intrusion into the Fourth Amendment rights of the owner or operator. In Opperman and Bertine, however, the Supreme Court held that such an intrusion was notunreasonable if accomplished within certain perimeters. The justifications for the intrusion — protecting the owner's property, protecting the police from false claims or disputes, and protecting the police from danger — are simply not served, however, when the inventory is inexcusably postponed; in that circumstance, the inventory becomes unreasonable.
If, for example, the police claim to be genuinely concerned about protecting an arrestee's property left in his vehicle after impoundment,[5] the genuineness of the concern is open to question when the inventory is delayed: the longer the period of time passing between when the police take custody of the vehicle and when the vehicle's contents are catalogued, the greater the opportunity that the property will be stolen, damaged, tampered with, spoiled, or otherwise not maintained in the owner's best interests. Similarly, as the time passes between impoundment and the time when the inventory is to begin, so increases the likelihood that the arrestee might be released and perhaps press a claim for "lost" items that the police would be unable to dispute due to the lack of an inventory, or that items could have been overlooked during a hurried inventory. Most obviously ignored by the passage of time is the concern of danger to the police; the other concerns, but especially this one, suggest that the inventory must be conducted with sufficient temporal proximity to the impoundment to serve its justifications.
A review of cases from the Court of Criminal Appeals involving inventories of automobiles confirms our reasoning. In most of those cases, the inventories upheld occurred on the same day as the arrest and impoundment. See, e.g., Ringer v.State, 489 So.2d 646 (Ala.Crim.App. 1986); Olds v. State,484 So.2d 517 (Ala.Crim.App. 1985); Vaughn v. State, 473 So.2d 661
(Ala.Crim.App. 1985); Morton v. State, 452 So.2d 1361
(Ala.Crim.App. 1984); Witcher v. State, 420 So.2d 287
(Ala.Crim.App. 1982); Jones v. State, 407 So.2d 870 (Ala.Crim.App. 1981); and Wilkinson v. State, 374 So.2d 396 (Ala.Crim.App.),writ denied, 374 So.2d 400 (Ala. 1979). In some cases, the inventory was done at the scene of the arrest. See, e.g., Stonev. State, 501 So.2d 562 (Ala.Crim.App. 1986); Thomas v. State,415 So.2d 1246 (Ala.Crim.App. 1982); Lippold v. State,365 So.2d 1015 (Ala.Crim.App. 1978), writ denied, 365 So.2d 1022
(Ala. 1979).
In the context of true inventory searches that are not conducted in relation to forfeiture proceedings,[6] the cases involving the longest lapses between impoundment and inventory we have found are one in which the inventory was delayed for eight hours and one in which the inventory was postponed until the morning after the arrest. In Rudd v. State, 649 P.2d 791
(Okla.Crim.App. 1982), the court upheld the validity of an inventory of an automobile conducted eight hours after its impoundment, given that the officer in charge of conducting *Page 1281 
inventories was detained by a complex investigation of the scene of the accident in which the subject automobile was involved and given that damage caused the automobile by the accident made entry into it difficult and time-consuming.Cf. United States v. Bosby, 675 F.2d 1174 (11th Cir. 1982) (although no delay issue was raised where inventory took place the day after impoundment, ensuring proper procedures in coordinated state and federal investigation may have sufficed as justification). In Black v. State, 418 So.2d 819
(Miss. 1982), the defendant unsuccessfully argued that the inventory performed on his automobile was illegal because it was conducted the morning after impoundment. The court upheld the inventory as valid because "all officers had to spend full time on [an emergency] detail." 418 So.2d at 820.
From the cases discussed immediately above, from the facts of previous cases from the Court of Criminal Appeals, and from the unspoken understanding evinced by the Supreme Court of the United States in Opperman and Bertine, we are convinced that our analysis is legally sound. Respondent argues in its brief that "[t]he record shows that the officers who inventoried the car were busily engaged in the first order of business during the interim before the inventory — locating the victims and the murder scenes and gathering and preserving evidence therefrom that was exposed to the elements, wild animals, or passersby." We appreciate this fact. The Fourth Amendment ensures the privacy rights of individuals, however, and in many circumstances the conduct of law enforcement officers must accommodate those rights.
We recognize that, generally speaking, inventory searches are constitutional on Fourth Amendment grounds. "Inventory searches must, however, 'be limited to effectuation of the recognized purposes for which they are conducted. . . .' " United Statesv. Bosby, 675 F.2d 1174, 1179 (11th Cir. 1982) (quoting UnitedStates v. Prescott, 599 F.2d 103, 105 (5th Cir. 1979)). We hold that the warrantless search in this case can not be upheld as an inventory search because of the insufficient temporal proximity between the impoundment and the search, with a lack of demonstrable justification based on exigent circumstances.
 B.
We also point out another basis for our conclusion that this search can not be upheld as a constitutional inventory. Boyd objected at trial to the admission of testimony concerning evidence obtained from the inventory on the ground that no testimony or other evidence established what the policies or procedures of the Anniston Police Department relating to inventory searches were. Given the holding in Colorado v.Bertine, supra, we are constrained to agree with the petitioner that this was a fatal defect in the State's attempt to justify the warrantless search as an inventory.
Throughout the majority, concurring, and dissenting opinions of Bertine are references to and quotations from the written procedures followed by the Boulder, Colorado, police department in conducting inventories. Accompanying that evidence was the testimony of officers concerning the manner in which inventories were accomplished. Upon review of that evidence, the Supreme Court was able to conclude that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment," Bertine,479 U.S. at 374, 107 S.Ct. at 742, and that police procedures were satisfactory so long as conducted "according to standard criteria." Id. at 375, 107 S.Ct. at 743.
Here, we can not determine whether the regulations of the Anniston Police Department relating to inventory searches are "reasonable," or whether the police acted in accord with "standard criteria." Sergeant Watson testified that the inventory was done "in compliance with the policies of the police department." Officer Bradley added that he "usually" took photographs of the subject automobile when a "major crime" was involved. Neither officer knew where the policy was recorded. Furthermore, *Page 1282 
there was no testimony whatsoever that provided the particulars of the policy. Without more, we can not possibly conclude that the police department's inventory policy was reasonable. Proving the reasonableness of a warrantless search is a burden borne by the State. Teat v. State, 409 So.2d 940
(Ala.Crim.App. 1981). Without such proof, the search is constitutionally defective. In this case, the issue was properly preserved, and we conclude that the search can not be upheld as an inventory.
We note that in previous cases in the Court of Criminal Appeals involving inventory searches of automobiles, a police officer's conclusory testimony that the inventory was done in compliance with departmental regulations was apparently held to be sufficient of itself to meet the Opperman and Bertine
standards. See, e.g., Stone v. State, 501 So.2d 562
(Ala.Crim.App. 1986); Vaughn v. State, 473 So.2d 661
(Ala.Crim.App. 1985); Thomas v. State, 415 So.2d 1246
(Ala.Crim.App. 1982); and Wilkinson v. State, 374 So.2d 396
(Ala.Crim.App.), writ denied, 374 So.2d 400 (Ala. 1979). To the extent that those cases, and others, hold that, despite proper and timely objection, a conclusory statement that policies were followed satisfies the Fourth Amendment requirement as set forth in Bertine, those cases are overruled.
Further support for our conclusion is found in United Statesv. Hellman, 556 F.2d 442 (9th Cir. 1977). In Hellman, an inventory search was held to be defective because the record disclosed no evidence of what the police department procedures relating to inventories were:
 "A Eugene police department regulation (Policy and Procedure Statement No. 17) provides for impounding of vehicles when they are parked in violation of law 'such as blocking * * * driveways,' and where the owner is arrested and there is no one to whom the vehicle can be released. Nothing is said in the regulation respecting the taking of an inventory of the car's contents. . . . The motion to suppress the items seized from the car was denied.
"On appeal, the government contends that the only question is whether the impounding of the car was pursuant to standard police procedure. If it was, it is contended, then it follows as matter of law that an inventory was proper and that the search was reasonable under the fourth amendment.
"In South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092,49 L.Ed.2d 1000 (1976), an automobile was impounded by the police of Vermillion, South Dakota, for overtime parking in a restricted zone. The car was taken to the city impound lot. From the outside of the car, a police officer observed a watch on the dashboard and other items of personal property in plain view. The officer then ordered the car unlocked and the contents of the car inventoried pursuant to police regulation.Id. at 380 n. 6, 96 S.Ct. 3092, [3102,] 49 L.Ed.2d 1000
(Powell, J., concurring). The Court held the inventory search to be reasonable under the fourth amendment. The Court noted that the practice followed by the police in Vermillion in inventorying and safeguarding the contents of impounded cars was standard police procedure generally followed throughout the country.
"The government here contends that since inventorying of impounded cars is, throughout the country, the practice generally followed by the police, it necessarily follows that it was reasonable here; that the only question, therefore, is whether the impounding itself was proper. We cannot agree.Opperman does not go this far. Quite the contrary is suggested. The Court states:
 " '[T]here is no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive.'
428 U.S. at 376, 96 S.Ct. at 3100 (footnote omitted).
"Here it is clear from the testimony of the searching officer that the citation, the impounding and the inventorying all were for 'an investigatory police motive.' This alone is sufficient to conclude that *Page 1283 
the warrantless search of the car was unreasonable.
 "But even if an investigatory motive was not shown, our decision would be the same because the inventorying of impounded cars was not shown to be a routine practice and policy of this police department, as was the case in Opperman. Certainly the record is clear that it was not the routine practice of the searching officer. It is the inventorying practice and not the impounding practice that, if routinely followed and supported by proper noninvestigatory purposes, could render the inventory a reasonable search under Opperman.
The fact that other police departments routinely follow such a practice may give support to the proposition that such a practice, if locally followed, is reasonable. It does not, however, render reasonable a search where the inventorying practice is not locally followed and the search, thus, is a departure from local practice. A locally followed practice gives some assurance that a particular car was not singled out for special searching attention. Absent such assurance some special reason for the taking of safeguarding or security precautions that are not customarily taken should exist if the intrusion resulting from the taking of such precautions is to be rendered reasonable under the fourth amendment."
Hellman, 556 F.2d at 443 (emphasis added).
There is also in the case before us no inventory list in the record. None of the officers who testified knew where the list was, although they did testify that one was made. We feel that this fact, also, contributes to the failure of the search to qualify as a constitutional inventory. Cf. Ex parte Hilley,484 So.2d 485, 488 (Ala. 1985) (inventory of defendant's purse upheld where complete list of purse's contents made). In the case at bar, the State's failure to provide evidence of the inventory list implanted one more impermissible chink in the petitioner's Fourth Amendment armor.[7]
We are not, by our holding herein, imposing new, strange, or unwarranted burdens on Alabama law enforcement agencies.[8]
Indeed, Opperman and Bertine created a narrow Fourth Amendment exception that renders admissible otherwise excludable evidence; however, for such evidence to pass constitutional muster, the record must sufficiently reflect what that policyis, describe the policy in such a way that its reasonablenesscan be reviewed, and present adequate evidence of what theemployed criteria were.
 II.
The final issue to be reviewed[9] concerns the finding by the Court of Criminal *Page 1284 
Appeals that the police had probable cause to search Boyd's car. Specifically, that court held that "[t]he police had probable cause to believe that the appellant's vehicle had been used in the commission of the crimes." What we find in the record is that 1) Lieutenant Carroll learned from Boyd shortly after the arrest that the clothes worn by Boyd and Milstead on the date of the crimes were on the front seat of Boyd's Camaro, and that 2) Sergeant Watson and Officer Bradley conducted an "inventory by request of Lieutenant Carroll."
It is a "well-recognized principle that, where a group of officers is conducting an operation and there is at least minimal communication among them, [the appropriate course is to] look to the collective knowledge of the officers in determining probable cause." United States v. Esle,743 F.2d 1465, 1476 (11th Cir. 1984); see also United States v. Willis,759 F.2d 1486 (11th Cir. 1985), cert. denied, 474 U.S. 849,106 S.Ct. 144, 88 L.Ed.2d 119 (1985); United States v. Balsamo,468 F. Supp. 1363 (D.Me. 1979). "[P]robable cause may emanate from the collective knowledge of the police, though the officer who performs the act of . . . searching may be far less informed."United States v. Hawkins, 595 F.2d 751, 752-53 n. 2 (D.C. Cir. 1978), cert. denied, 441 U.S. 910, 99 S.Ct. 2005,60 L.Ed.2d 380 (1979) (citing Smith v. United States,358 F.2d 833, 835 (D.C. Cir. 1966), cert. denied, 386 U.S. 1008,87 S.Ct. 1350, 18 L.Ed.2d 448 (1967), and Williams v. United States,308 F.2d 326, 327 (D.C. Cir. 1962)). In the instant case, Lieutenant Carroll had probable cause to search Boyd's vehicle, and Sergeant Watson and Officer Bradley acted pursuant to his directive. Therefore, the police had probable cause, based on their collective information, to search Boyd's vehicle.
In Opperman, the Supreme Court recounted the rationale that generally excuses the warrant requirement of the Fourth Amendment to the federal constitution when police officers have probable cause to search an automobile:
 "This Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment. Although automobiles are 'effects' and thus within the reach of the Fourth Amendment, Cady v. Dombrowski, 413 U.S. 433, 439[, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706] (1973), warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not. Cardwell v. Lewis, 417 U.S. 583, 589[, 94 S.Ct. 2464, 2468, 41 L.Ed.2d 325] (1974); Cady v. Dombrowski, supra, [413 U.S.] at 439-440[, 93 S.Ct. at 2527]; Chambers v. Maroney, 399 U.S. 42, 48[, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419] (1970).
 "The reason for this well-settled distinction is twofold. First, the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. Carroll v. United States, 267 U.S. 132, 153-154 [45 S.Ct. 280, 285, 69 L.Ed. 543] (1925); Coolidge v. New Hampshire, 403 U.S. 443, 459-460 [, 91 S.Ct. 2022, 2034, 29 L.Ed.2d 564] (1971). But the Court has also upheld warrantless searches where no immediate danger was presented that the car would be removed from the jurisdiction. Chambers v. Maroney, supra, [399 U.S.] at 51-52 [, 90 S.Ct. at 1981]; Cooper v. California, 386 U.S. 58 [, 87 S.Ct. 788, 17 L.Ed.2d 730] (1967). Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. In discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly noncriminal in nature. Cady v. Dombrowski, supra, [413 U.S.] at 442 [, 93 S.Ct. at 2528]. Automobiles, unlike homes, are subjected to pervasive and *Page 1285 
continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.
 "The expectation of privacy as to automobiles is further diminished by the obviously public nature of automobile travel. Only two Terms ago, the Court noted:
 " 'One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. . . . It travels public thoroughfares where both its occupants and its contents are in plain view.' Cardwell v. Lewis, supra, [417 U.S.] at 590 [, 94 S.Ct. at 2469]."
Opperman, 428 U.S. at 367-68, 96 S.Ct. at 3096 (footnote omitted). In the case at bar, the warrant requirement is therefore excused.
The four-day delay between the impoundment and the search is not unreasonable due merely to the passage of time. UnitedStates v. Johns, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890
(1985), illustrates this point quite well. In Johns, law enforcement officers arrested several persons at a remote Arizona airstrip. Prior to the arrest, the law enforcement officers had watched the arrestees maneuver their trucks up to a small airplane that had landed. At the time of the arrest, the officers smelled the odor of marijuana coming from the trucks and saw in the trucks several packages that were wrapped and sealed in a manner that to the officers resembled the manner in which smuggled marijuana is packaged. The officers had probable cause to search the trucks at the airstrip, but, instead, took them to the Drug Enforcement Agency headquarters and, without a warrant, searched them and containers found within them three days later. Borrowing from United States v.Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the Court in Johns recounted that " 'an individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband' " (quoting Ross, 456 U.S. at 823,102 S.Ct. at 2172) and that " 'if probable cause justified the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search' " (quoting Ross, 456 U.S. at 825,102 S.Ct. at 2173). Johns, 469 U.S. at 484, 105 S.Ct. at 885. With this predicate, the contention that the three-day delay between the impoundment and the warrantless vehicle search made the search unreasonable was promptly dismissed. "[W]here police officers are entitled to seize the container and continue to have probable cause to believe that it contains contraband, we do not think that the execution of the warrantless [vehicle] search is necessarily unreasonable." Johns, 469 U.S. at 487,105 S.Ct. at 886. That Court added one caveat, which we find to be inapplicable here because Boyd offered no proof that any privacy interest was adversely affected:
 "We do not suggest that police officers may indefinitely retain possession of a vehicle and its contents before they complete a vehicle search. Cf. Coolidge v. New Hampshire, 403 U.S. 443, 523, 91 S.Ct. 2022, 2066, 29 L.Ed.2d 564
(1971) (WHITE, J., dissenting). Nor do we foreclose the possibility that the owner of a vehicle or its contents might attempt to prove that delay in the completion of a vehicle search was unreasonable because it adversely affected a privacy or possessory interest. Cf. United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110
(1983)."
Id.
Based on our reading of Johns, we conclude that, because the officers of the Anniston Police Department did in fact have probable cause to search Boyd's vehicle at the time it was impounded, and because that probable cause continued throughout the four days between the impoundment and the search, the warrant requirement of the Fourth Amendment was excused. We *Page 1286 
are fully cognizant that "[t]he fourth amendment provides the minimum threshold of privacy protection in the United States. States can provide their citizens with additional rights supplementing those rights afforded by the federal constitution." Comment, Colorado v. Bertine Opens the InventorySearch to Containers, 73 Iowa L.Rev. 771, 793 (1988). Because the search was proper under the "vehicle search" exception to the warrant requirement of the Fourth Amendment of the federal constitution and under article I, § 5, of the State constitution, the evidence obtained during that search was properly admissible against Boyd at trial.
 III.
In summary, we hold that the evidence obtained from Boyd's vehicle was admissible, because the officers of the Anniston Police Department who conducted the search had probable cause to believe that evidence of the fruits or instrumentalities of Boyd's crimes were in his car. This we hold despite our conclusion that the search can not be upheld as a valid inventory.
We have searched the record for any instances of plain error and have found none. We have also reviewed the record in its entirety and have concluded that the death penalty is neither excessive nor disproportionate punishment in light of this particular crime, this defendant, and prior similar cases. Therefore, we affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
MADDOX, JONES, ALMON, SHORES, ADAMS,** HOUSTON and STEAGALL,**
JJ., concur.
KENNEDY, J., not sitting.
[1] Milstead pleaded guilty in a separate action to capital murder.
[2] Impoundment of Boyd's automobile in this situation was lawful. See Code 1975, § 32-5A-139(c)(3); see also Ringer v. State,489 So.2d 646 (Ala.Crim.App. 1986); Morton v. State,452 So.2d 1361 (Ala.Crim.App. 1984).
[3] The basis of the dissent was, in essence, that the standardized procedures involved in Bertine afforded the police too much discretion.
[4] In Wilkinson, we referred to Daniels v. State, 290 Ala. 316,276 So.2d 441 (1973), wherein "at least six" other exceptions to the Fourth Amendment warrant requirement were recognized: plain view, consent, incident to a lawful arrest, hot pursuit, exigent circumstances plus probable cause, and stop and frisk.
[5] In this case, the impound lot where Boyd's Camaro was taken is behind the Anniston Police Department. The impound lot was fenced, has a locking gate, and no unauthorized personnel had access to the lot. After Boyd's Camaro was "secured" in the lot, its windows were rolled up, its doors were locked, and the impound lot gate was locked. The Camaro remained secure in that manner until it was unlocked for the inventory.
[6] We find that those cases that involved inventory searches conducted on an automobile subject to forfeiture proceedings are inapposite. Respondent, for example, relies on Cooper v.California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), in which a vehicle subject to forfeiture four months after its seizure was searched one week after seizure. The Court there stated, "It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it." 386 U.S. at 61-62, 87 S.Ct. at 790-91. In the case now before us, when the car was first impounded, there was no assurance whatsoever that the Anniston Police Department would have to retain custody of Boyd or the car for any length of time, whether fixed or indefinite. "Cooper, then, only encompassed the situation in which the car is held for a substantial period of time pending litigation of the forfeiture issue." 3 LaFave, Search and Seizure § 7.4(a) (2d ed. 1987).
[7] The list produced as a result of the inventory would be appropriate, although perhaps not conclusive, evidence that the inventory was conducted in compliance with the regulations. The court in People v. Long, 419 Mich. 636, 359 N.W.2d 194, 199-200
(1984), quoted with approval 2 LaFave, Search and Seizure § 7.4 and stated that " 'a purported inventory should be held unlawful when it is not shown, "for [instance], that standard inventory forms were completed and kept for future reference (showing presence or absence of valuables), nor that a place of safekeeping for valuables so secured was maintained." ' " (Quoting State v. Jewell, 338 So.2d 633, 639 (La. 1976).) See also Manalansan v. State, 45 Md. App. 667, 415 A.2d 308, 311
(1980) (inventory illegal were "[n]o list was made . . . of nonevidentiary items, either by way of listing them or by way of indicating that none were present"); Reese v. Commonwealth,220 Va. 1035, 265 S.E.2d 746, 749 (1980) (no valid inventory where conducted "[w]ithout preparing a list of the contents of the car, [and] the officers simply seized what they were seeking").
[8] See United States v. Bosby, 675 F.2d 1174, 1179 (11th Cir. 1982) ("[t]he record reveals that the Birmingham[, Alabama,] police had a written policy concerning inventory searches and routinely performed them after impounding a vehicle").
[9] At the trial of this case, the trial court refused to redefine "murder" and "capital murder" for the jury upon the jury's request for that distinction after beginning deliberations. The record indicates that Boyd's counsel made no objection to the court's action; Boyd's counsel adamantly insists otherwise. At a post-judgment hearing to correct or supplement the record, the trial court concluded that no objection was made. The Court of Criminal Appeals refused to consider the issue, but stated, in dicta, that the trial court committed no error. Assuming, without deciding, that the issue is properly before this Court, we find that the action of the trial court is not error inasmuch as the jury was fully instructed on the matters at issue.
** Although Justices Adams and Steagall were not present at oral argument, they have listened to the tapes.