682 So.2d 385 (1996)
Ex parte State of Alabama.
Re STATE
v.
James JOHNSON, Jr.
1941554.
Supreme Court of Alabama.
April 26, 1996.
Jeff Sessions, Atty. Gen., and J. Thomas Leverette, Asst. Atty. Gen., for Petitioner.
Morris Dees and J. Richard Cohen, Montgomery, H. Dean Mooty, Jr., Montgomery, for Respondent.
*386 HOOPER, Chief Justice.
James Johnson, Jr., was indicted for the capital murder of a 16-month-old child named Jalesa. He filed a motion to suppress certain statements he had made to the police, arguing that he had been arrested without probable cause. The trial court granted the motion to suppress. The State appealed. The Court of Criminal Appeals affirmed, without opinion.
Jalesa was the child of Johnson's girlfriend, with whom Johnson was living. The child was brought by her mother to a hospital with bruises and vomiting; she was later discharged. Later that same day, paramedics were called to the residence of the mother and child, and an ambulance transported Jalesa to the hospital's emergency room. Johnson and the mother were the only persons present with the child when the paramedics arrived. The child was readmitted to the hospital. Around 8:00 p.m., doctors at the hospital telephoned and informed the police that the bruises on Jalesa appeared to be caused either by child abuse or by leukemia. Detective S.E. Cowart testified that when he arrived at the hospital he discovered that the baby had bruises on her back and hips and had three broken ribs. Detective Cowart questioned the mother, who stated that she had been grabbing the child around the ribs while holding her. The mother stated that the bruises on the child's hips were caused by her diapers.
Detective Cowart asked Johnson to go with him to the mother's apartment so that Cowart could view the apartment for suspicious physical circumstances. Johnson voluntarily went with Detective Cowart, while the mother stayed with the child. Cowart observed nothing suspicious, and he and Johnson returned to the hospital. Johnson told Detective Cowart that Jalesa had been found unconscious and that he had tried to administer CPR to her. Johnson said he could have broken her ribs at that time. Dr. Sobell, the doctor initially treating the child, told Cowart that the broken ribs could possibly have been caused by Johnson's performing CPR on the child.
Sometime between 10:25 p.m. and midnight, doctors determined that the child was not suffering from leukemia, and the doctors' opinion was that the child had been abused. Around 12:15 a.m., Detective Cowart asked Johnson to go with him to police headquarters so that Cowart could question him. The mother stayed at the hospital while the child was being treated. Johnson voluntarily went with the officer. About 1:15 a.m., Officer Cowart received notice that the child had died; he then turned the case over to the police department's robbery/homicide division.
Detective Michael Jones was then placed in charge of the investigation. Johnson had not been restrained in any manner while he was at the police station. Around 2:50 a.m., Johnson was brought into a homicide division office for questioning and there was presented with a Miranda waiver form. On the form in the space labeled "charge" were the words "capital murder." Jones questioned Johnson from 2:50 to 4:45 a.m. During the questioning, Johnson admitted to striking and shaking the child in an attempt to stop her from crying. Later, he admitted also to holding her down on a couch and placing his knee into her abdomen and chest. The only two people the police had reason to believe had been with the child were the mother and Johnson; the trial court, in fact, found that they had been the only people with the child at the time of her injuries.
In suppressing Johnson's statements, the trial judge said that the mother had given an explanation for some of the child's injuries that the detective found implausible, while Johnson had given an explanation for the child's ribs being broken that Dr. Sobell said was reasonable. Therefore, the trial judge said that the only reasonable inference from the fact of Johnson's arrest was that the detectives did not believe Johnson's explanation either. However, there existed other information from which the detectives could have determined that there was probable cause to arrest Johnson.
Johnson's explanation was that he had performed CPR on the child and thus might have broken her ribs. The child had other symptoms, such as vomiting and bruises over different parts of the body; Johnson offered *387 no explanation for these symptoms. Dr. Sobell said only that Johnson's explanation was a plausible one. The doctors concluded, sometime between 10:25 and midnight, that the child had been abused. After the doctors informed the police of this conclusion, the police knew that either the mother or Johnson or both were not telling the whole story. Therefore, the police had probable cause to arrest the mother and Johnson.
In addition, the trial judge seemed to weigh the probable cause to arrest the mother against the probable cause to arrest Johnson. The trial judge said, "[I]t does not appear that it was any more reasonable to suspect Johnson than it was to suspect anyone else who had been with the child." (R.T. 226.) The police could not explain to the trial judge's satisfaction why there was greater probable cause to arrest Johnson than there was to arrest the mother. Therefore, the trial judge decided there was no probable cause to arrest Johnson. Probable cause to arrest one person, however, does not depend on a lack of probable cause to arrest another person.
From the time the doctors concluded that the child had been abused, the police had probable cause to arrest either Johnson or the mother. This Court, in Ex parte Beck v. State, 485 So.2d 1207 (Ala.1985), held that probable cause existed where "the defendant's truck had been seen at the [victim's] home on the afternoon of the killing" and the police had seen a pair of boots with blood splattered on them in the defendant's truck. 485 So.2d at 1210.
The police knew that only Johnson and the mother were with the child when the paramedics arrived. Johnson gave the police an explanation for the child's broken ribsthat he had given her CPR. That did not explain the bruising and the vomiting. In addition, the record does not reveal that Jalesa was in cardiac arrest when the paramedics arrived. She was in respiratory arrest, but that does not require chest compression; it requires only breathing assistance. The fact that Johnson had given Jalesa CPR, or the fact that he had not done so, would not have required the police to exclude Johnson as a suspect. At the time, the police knew of only two people who could have committed the abuse, either the mother or Johnson or both of them. Once the doctors told the police they believed that child abuse had caused the child's injuries, the police had probable cause to detain and/or to arrest two peoplethe mother and Johnson. The fact that they chose to detain and question Johnson first was an eminently practical choice. It was a decision for the police investigators to make at the time, and if probable cause then existed to detain Johnson, the courts will not nullify the decision of the police.
Once the police have probable cause to arrest two or more people, the police make a judgment as to whom to arrest and when. Thus, the fact that the police chose not to arrest the mother, even though they had probable cause to arrest her, does not invalidate the probable cause to arrest Johnson. The police often must make discretionary decisions, which the courts will uphold unless probable cause is clearly absent. In this case, the police had to decide whom to arrest and when, considering the possibility that the mother was covering for Johnson or that one of the suspects might inform on the other if sufficient pressure was applied. In cases that involve more than two suspects, a rule requiring the arrest of all suspects for whom there was probable cause would hamstring the police. Such a rule would prevent the police from exercising the discretion they need to properly investigate a case.
The trial judge held that Johnson was arrested at 2:50 a.m. The police record indicated this as the time of arrest. The first argument the State made at the suppression hearing, which it made again on appeal, was that Johnson was not arrested until 4:45 a.m. Because we determine that probable cause was present at 2:50 a.m., as well as at 4:45 a.m., we need not determine the time of the arrest.
At 2:50 a.m., the police had probable cause to arrest Johnson. The level of evidence needed for a finding of probable cause is low. "An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest].... `[O]nly the probability, and not a prima facie showing, of criminal activity *388 is the standard of probable cause.'" Stone v. State, 501 So.2d 562, 565 (Ala.Cr.App.1986). "`Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'" Young v. State, 372 So.2d 409, 410 (Ala.Cr.App.1979) (quoting Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959)).
Because the officers had sufficient evidence to support a finding of probable cause to arrest Johnson, and because the trial judge pitted that evidence against the evidence that would have suggested probable cause to arrest the mother, the trial judge abused his discretion in determining that there was no probable cause to arrest Johnson and that Johnson's statements were therefore inadmissible.
The judgment of the Court of Criminal Appeals affirming the trial court's order suppressing the evidence of the statements is reversed. This case is remanded, and the Court of Criminal Appeals is directed to remand the case to the trial court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
SHORES, J., concurs.
MADDOX, J., concurs specially.
COOK and BUTTS, JJ., concur in the result.
MADDOX, Justice (concurring specially).
I concur specially in order to state why I believe the warrantless arrest was valid and why I also believe the incriminating statements were not tainted by improper police conduct.
Although there could be a question whether the defendant was arrested at 2:50 a.m. or at 4:45 a.m., this does not affect the admissibility of the confession because, given all the attendant facts and circumstances, the officers had probable cause to detain Johnson at 2:50 a.m. and to question him about the death of the child. Stated differently, I can agree with the trial court that Johnson had been arrested at 2:50 a.m.,[1] but this does not make any difference in view of the fact that there was sufficient probable cause for the officers to believe, based on the facts within their knowledge, that the defendant had committed, or had aided in the commission of, the abuse of the child.
The single legal question presented in this case is: Should the defendant's statement be suppressed on the basis that it was obtained during a period of illegal detention and therefore was not the result of an independent act of free will? Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). Thus, we must determine applying, the totality-of-the-circumstances analysis of Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), whether the officers had probable cause to arrest Johnson at 2:50 a.m.
In order for a police officer to make a valid arrest without a warrant, the officer must have "probable cause to believe that a felony has been committed, or is being committed, and that the person to be arrested committed it." Rule 4.1, Ala.R.Crim.P.; see also Brooks v. City of Dothan Police Dep't, 562 So.2d 162 (Ala.1985); Ex parte Beck v. State, 485 So.2d 1207 (Ala.1987). In determining whether there was probable cause to make an arrest, the officers' subjective intent is immaterial. Brooks, 562 So.2d at 163. For the purposes of this probable-cause analysis under Brooks, it is irrelevant, and in fact impermissible, to consider whether the officers intended to arrest Johnson at 2:50 a.m. or at some later time.
In determining whether the officers had probable cause to make an arrest, the Court must look at the knowledge of the officers at the time of the arrest. See Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 *389 (1983). In Gates, the United States Supreme Court abandoned the "two-pronged test" for determining probable cause under Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and adopted a "totality-of-the-circumstances" approach to determining probable cause. In setting forth the "totality-of-the-circumstances" approach, the Court stated:
"Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a `practical, nontechnical conception.' Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). `In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Id., at 175, 69 S.Ct., at 1310. Our observation in United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), regarding `particularized suspicion,' is also applicable to the probable cause standard:
"`The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'
"As these comments illustrate, probable cause is a fluid conceptturning on the assessment of probabilities in particular factual contextsnot readily, or even usefully, reduced to a neat set of legal rules....
". . . .
"As early as Locke v. United States, 7 Cranch. 339, 348, 3 L.Ed. 364 (1813), Chief Justice Marshall observed, in a closely related context, `[T]he term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation.... It imports a seizure made under circumstances which warrant suspicion.' More recently, we said that `the quanta ... of proof appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. Brinegar, supra, 338 U.S., at 173, 69 S.Ct., at 1309. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to `probable cause' may not be helpful, it is clear that `only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' Spinelli, 393 U.S., at 419, 89 S.Ct., at 590. See Model Code of Pre-Arraignment Procedure § 210.1(7) (Proposed Off. Draft 1972); 1 W. LaFave, Search and Seizure, § 3.2(e) (1978)."
462 U.S. at 231-35, 103 S.Ct. at 2330 (footnotes omitted).
Based on this test, the trial court had to determine whether at 2:50 a.m. a reasonable and prudent person possessed of the knowledge the officers had would believe that a felony had been committed (i.e., that the child had been murdered), and that the defendant, Johnson, had committed the felony or had aided and abetted its commission. For this analysis, I find it necessary to repeat the facts known to the officers at 2:50 a.m., as found by the trial judge in his order:
"Jalesa Marshay McQueen, 16 months old, was the child of Yolanda McQueen. Jalesa lived with her mother and her mother's boyfriend, Johnson. Apparently, Jalesa's mother took her to the emergency room at Montgomery Regional Medical Center sometime during the day of November 4, 1992. Jalesa was admitted with symptoms of vomiting, and she was later discharged. Later that day paramedics were called to the residence and Jalesa was transported to the hospital's emergency room by ambulance. The testimony at the hearings in this matter did not reveal *390 her symptoms when she was returned to the hospital, but, apparently, the child had suffered cardiac arrest.
"At about 8:00 p.m. on November 4, 1992, Detective Cowart, Juvenile Division of the Montgomery Police Department, was dispatched to the hospital in response to a report of child abuse regarding the child. He learned from the physicians and his observations that the child had bruises on her back, bruises on her hips and three broken ribs. Physicians at the hospital advised Cowart that the child's symptoms could be child abuse or could be the result of leukemia. Cowart questioned Yolanda McQueen regarding the bruises on the child. Cowart doubted Yolanda's explanation.[[2]] He also spoke to Johnson, who told him that the child's ribs could have been broken because he attempted to administer CPR to the child before the child was brought to the hospital. A physician at the hospital, Dr. Sobell, told him that Johnson's explanation was reasonable.
"The child was later transported to Baptist Medical Center to be treated at the neonatal unit. Cowart went to Baptist, where he was informed that the child had rearrested, and Dr. Durant told him that the child was not suffering from leukemia.
"Cowart then asked Johnson to accompany him from the hospital to the mother's apartment so that Cowart could view the apartment in an effort to determine if there were any suspicious physical circumstances within the apartment that he should photograph. Johnson voluntarily accompanied Cowart to the apartment, and they later returned to the hospital. Apparently, Cowart observed nothing at the apartment which raised his suspicions or he felt needed to be photographed. Cowart and Johnson returned to Baptist.
"At about 12:15 a.m. on November 5, 1992, Cowart asked Johnson to accompany him to police headquarters so that he could question him and gather information. Cowart testified that he did not consider Johnson a suspect at this time, and Cowart did not consider the child's mother a suspect. Upon arriving at headquarters Johnson was placed in an office in the Juvenile Division in the basement of the building. At about 1:15 a.m. Cowart received a call that the child had died. At this point, the case was turned over to the robbery/homicide division of the Montgomery Police Department. Detective Michael Jones was placed in charge of the investigation. Jones, Cowart and Sgt. Locklar conferred from 1:15 until 1:45 a.m., at which time Cowart brought Johnson up to the detective offices in the robbery/homicide division. Jones testified that at this time Cowart suspected Johnson was guilty of criminal activity, however, based on the testimony given by Jones and Cowart, the only additional information that Cowart possessed was that the child had died."
(Footnotes omitted.) Later in his order, the trial judge stated that the officers also knew at 2:50 a.m. that "both Johnson and McQueen had been with the child on November 4, 1992," and cited Detective Michael Jones's response to the Court's questioning during the suppression hearing. The specific testimony of Detective Jones referred to by the trial judge is as follows:
"Later, [Cowart] said at the point the child died the physician had clarified his position and specifically stated that he felt like the death had been the result of abuse. And that there were multiple injuries to substantiate the abuse allegation. He further advised me that there were two adults present with the child in the home and at the hospital, that being the defendant and the child's mother. Up until that point, that's probably a synopsis of the information I received. It would have been much more detailed at that time. But I'm afraid it has been two years now, and I don't have much more of a detailed memory."
Transcript of proceedings, September 30, 1994, at p. 5. As the trial judge noted, Detective Jones, who made the actual arrest at 2:50 a.m., had been fully advised of the *391 facts of the case by Detective Cowart. Regardless of this fact, this Court has held:
"It is a `well-recognized principle that, where a group of officers is conducting an operation and there is at least minimal communication among them, [the appropriate course is to] look to the collective knowledge of the officers in determining probable cause.' ... `[P]robable cause may emanate from the collective knowledge of the police, though the officer who performs the act of ... searching [or arresting] may be far less informed.'"
Boyd v. State, 542 So.2d 1276, 1284 (Ala.1989) (citations omitted).
The pertinent facts known to the officers, as found by the trial judge, are that Johnson and the child's mother were with the child on November 4, 1992, that the child lived with Johnson and the mother, that the child was abused, that the child died from the abuse, that the officers found the child's mother's story to be unbelievable, that Johnson admitted at the hospital that he had touched the child and probably had caused some of the injuries by, he said, performing CPR (this story also became unbelievable when the physician found the injuries to be the result of child abuse rather than leukemia).
Applying the probable cause standard set forth in Gates, I conclude that these facts and circumstances are in themselves sufficient to warrant a person of reasonable caution in believing that the child was murdered and that Johnson committed the murder or aided and abetted in its commission. As Gates states, we are dealing only with probabilities, not the more stringent standard required for a conviction. As the Supreme Court said in Gates, police officers are factfinders"practical people" permitted to formulate "certain common-sense conclusions about human behavior." 462 U.S. at 231, 103 S.Ct. at 2329. Based on the findings of fact made by the trial judge, and applying the Gates standard, I can conclude only that the officers had a right to detain and question Johnson at 2:50 a.m. Further, because of this legal right to detain Johnson, the statement given by Johnson should not have been suppressed as having been obtained during a period of illegal detention and therefore not the result of an independent act of Johnson's free will. Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).
The trial judge stated that "it does not appear that it was any more reasonable to suspect Johnson than it was to suspect anyone else who had been with the child." However, the probable cause standard does not require that the arresting officer rule out all other possible suspects before detaining a particular person. It appears that the trial judge, in suppressing the evidence based on this statement, has applied a more stringent standard than a person of reasonable caution would believe that Johnson had committed the offense.
This Court was faced with a similar situation in Ex parte Beck v. State, 485 So.2d 1207 (Ala.1985). In Beck, the arresting officers had been informed by a witness that he had seen the defendant's truck, not the defendant Beck himself, near the victim's home on the afternoon of the murder. The arresting officers went to Beck's home and saw his truck parked in the driveway. The officers looked into the truck and saw there, in plain view, a pair of boots that appeared to have blood on them. The officers next spoke to Beck and his wife and observed their reactions when they told them of the nature of his investigation. The Court held that this evidence was sufficient to give the officers probable cause to arrest Beck. This Court did not hold that the officers first had to determine whether Beck had lent his truck to anyone on the afternoon of the murder or to determine whether his wife had used the truck that afternoon, despite a very reasonable assumption that his wife had had access to the truck.
In the present case, the evidence creating probable cause is even stronger than the evidence in Beck. Specifically, Johnson had lived with the child, who later died of diagnosed child abuse, and he admitted at the hospital that he had touched the child in a manner that probably could have caused some of the injuries. It is also true that the mother of the abused child had physical possession of the child and it is true that she told the police an unbelievable story concerning the child's injuries. However, this did not preclude the officers from validly arresting *392 Johnson under the Gates standard, especially in light of the fact that the state recognizes accomplice murder. The fact that the prosecutor proceeded on a theory that Johnson had actually inflicted the injuries to the child does not prevent the arrest of Johnson from being valid under the theory of complicity to capital murder. The theory that Johnson was validly arrested as an accomplice to murder is especially supported by the findings of the trial judge, which suggest that the statements given to officers by both the mother and Johnson at the hospital concerning the child's injuries were unbelievable at the 2:50 a.m. arrest. I believe that a person looking at the findings of the trial court and exercising reasonable caution, could find that both the mother and Johnson were probably involved in covering up the events surrounding the child's death. This is all that is required for a valid arrest.
Based on the foregoing, I believe that the trial court applied a more stringent standard to his findings of fact than is required by the probable cause standard set out in Illinois v. Gates. I have written this special concurrence to show the reasons for that belief.
NOTES
[1] I note that it was at this time that Johnson was read his Miranda rights by Homicide Detective Michael Jones and was presented with a Miranda waiver form. The form listed "capital murder" in the space labeled "charge." This would also satisfy Rule 4.1(a)(2), Ala.R.Crim.P., which provides that "[t]he law enforcement officer shall inform the person arrested of the officer's authority and the cause of the arrest."
[2] The trial judge chose not to include in his findings of fact the explanation given to the police officers by the mother regarding the bruises on the child. This explanation, as testified to by Detective Cowart, was that bruises on the child's hips had been caused by the child's diapers.