Possession of marijuana; sentence: fifteen years imprisonment.
V.M. Armstrong testified that on March 14, 1978, he was a member of the Montgomery Police Department. At 9:05 p.m. that date, he began conducting a surveillance of the appellant. The surveillance began at the Richard Manor Apartments on South Court Street in Montgomery. The appellant stayed at an apartment an unspecified period of time and then left in an automobile with a female and went to Shoney's Restaurant on the Southern By-Pass. After an unspecified period of time at Shoney's, the appellant made a telephone call and returned to the table for approximately ten minutes. He then left Shoney's by himself and drove to a nearby McDonald's restaurant. Officer Armstrong did not recall anything the appellant did at McDonald's, but did recall that he stayed there five or ten minutes and then went back to Shoney's and picked up his female companion and returned to the apartment. The appellant remained at the apartment about thirty minutes and then left by himself carrying "a small brown briefcase or handbag." He drove to the Boomerang Lounge on Federal Drive. The appellant stayed there about two hours during which time he was observed once talking to a white male in a "black over gold Chevrolet Nova." On another occasion, the appellant and another white male walked to the appellant's vehicle, opened the trunk, and removed the briefcase or handbag and sat in the car a while. The car was moved from one location of the parking lot to another and back, then the occupants got out of the car. The appellant later left the lounge and drove back to the apartment which he entered carrying the brown handbag.
At approximately 3:45 a.m., the appellant placed some items in the trunk of his automobile and left, proceeding on the Southern By-pass travelling in an easterly direction. By prearrangement, Officer Armstrong had a marked patrol car stop the appellant's vehicle. The appellant was then transported to the police department in the marked vehicle, and Armstrong took custody of the appellant's automobile and drove it to the police department. On entering the appellant's vehicle, Armstrong noticed the ashtray was opened, and he observed what appeared to him to be marijuana leaves and stems inside the ashtray. At the police station, Armstrong turned the substance from the ashtray over to the State Toxicologist for criminal analysis. He then proceeded to search the appellant. At that point in the testimony, counsel for appellant moved for a voir dire examination of the witness, and the jury was excused from the courtroom.
The following transpired, in pertinent part, during the course of the voir dire examination of Officer Armstrong:
 "Q. Okay. At that time the car was proceeding down the Southern By-pass. Was it acting unusual?
"A. No, sir.
"Q. Was it breaking any traffic laws?
"A. None whatsoever, that I observed.
* * * * * *
"Q. You saw him bring something out of the apartment?
"A. That is correct.
 "Q. Could you tell what — It was either a bag or a box or something — A suitcase or briefcase?
"A. That is correct.
 "Q. But it was something that was an everyday appearance?
"A. That is correct.
"Q. Okay. Did you see him proceed to Shoney's? *Page 411 
"A. Yes, sir, I did.
 "Q. Did you see anything unusual in Shoney's, other than the telephone call and them sitting there?
"A. None whatsoever.
"Q. Did you watch him proceed to McDonald's?
"A. That is correct.
 "Q. Did you see him go in there or do whatever he did there?
 "A. I cannot recall exactly what happened. Nothing unusual.
* * * * * *
"Q. And you saw him pick the female up and they left?
"A. That is correct.
"Q. And that is all he did there at that time?
"A. That is correct.
* * * * * *
 "Q. Could you see what was going on in the apartment while he was there for this number of minutes or hours?
"A. No, sir.
"Q. And then you saw him leave the apartment?
"A. That is correct.
"Q. And you saw him get in his vehicle and depart?
"A. That is correct.
 "Q. Okay. When you stopped the car had you called ahead to have the car stopped; his car?
"A. That is correct.
* * * * * *
 "Q. When the Defendant was removed from the car could you look into the vehicle?
"A. Yes, sir.
 "Q. Okay. Could anyone else driving by the vehicle have been able to look in and observe the interior of the car? Was the weather good enough that they could have or —
 "A. No. The weather was very poor. I don't think anybody driving by would have been able to look into the vehicle unless the light was on. Because the rain was all over the windshield and windows and it was raining.
 "Q. Okay. Were there any bags of marijuana in the car on the seat in plain view?
"A. Nothing."
The appellant then moved to exclude the testimony of the witness and moved to exclude the fruits of any search because there was no probable cause to support the arrest. The trial judge then began to ask questions of the witness:
 "THE COURT: You have been with the vice squad how long, sir?
 "A. I was with them approximately, at that time, I believe, fifteen months.
"THE COURT: Did you have this man under surveillance?
"A. Yes, we did.
 "THE COURT: Did he have a reputation of being part of the drug culture?
"A. Yes, he did.
 "THE COURT: Is that the reason you had him under surveillance?
"A. That is correct.
"THE COURT: He was not a stranger to you, was he?
"A. No, sir, he was not.
"THE COURT: Overrule your objection."
Defense counsel then asked additional questions on voir dire concerning how the police officers obtained their information concerning the appellant's arrival in Montgomery:
 "Q. And you had received this information from someone?
"A. That is correct.
 "Q. And how early in the day had you received this information?
 "A. The information came at approximately 8:00 p.m. that night.
 "Q. So, approximately an hour before he got there — or less.
"A. That is correct.
"Q. Now, did you know where he came from?
"A. No, sir.
"Q. Okay. Is he from Montgomery?
"A. No, sir, he is not.
"Q. Do you know where he is from? *Page 412 
"A. Yes, sir, Ozark, Alabama.
 "Q. How long does it take to get from Ozark to Montgomery?
 "A. Driving the speed limit, approximately an hour and a half, I would say.
 "Q. So, someone would have informed you that he was on the way while he was in fact on the way, because he got here in less — You saw him at 9:05?
"A. That is correct."
The trial court again made a ruling adverse to the appellant stating:
 "If in the proper, diligent exercise of duties a person has a known reputation of being a law violator and a member of the drug culture, then that is sufficient probable cause to watch him. And if he engages in unusual conduct, or the usual contact that drug and dope peddlers engage in, then so far as this Court is concerned — I can't talk about any other Court — but as far as this Court is concerned it is probable cause.
* * * * * *
 ". . . I have heard many of these cases, and the conduct described by this gentleman is conduct that is usual conduct for drug dealers and dope peddlers. It need not have to be unusual conduct for dope peddlers to walk around with sacks, first one place and then another. Overrule the objection. Now, let's get the jury back."
Officer Armstrong was then allowed, over repeated objections, to testify as to the fruits of the search.
 I
As defined in Draper v. United States, 358 U.S. 307, 313,79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959):
 ". . . Probable cause exists where `the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. . . ." (Citation omitted.)
Before information from an unidentified informant will support probable cause, two tests must be passed. The "basis" test and the "veracity" test are as follows:
(a) Did the informant give the officer some of the underlying circumstances from which the informant concluded the appellant was in possession of marijuana?
(b) Did the officer know of some underlying circumstances from which he could conclude that the informant was credible or that his information was reliable?
See: Roberson v. State, Ala.Cr.App., 340 So.2d 459 (1976);Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584,21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108,84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).
A mere conclusion on the part of an informant will not support probable cause. The informant must have some basis for his conclusion, and he must relate that basis to the officer. The record in the instant case is absolutely silent as to the basis of the informant's information and as to the credibility or reliability of the informant. The record only discloses that "someone" told Officer Armstrong that the appellant was coming to Montgomery. The testimony does not even establish that the informant told the officer that the appellant was in possession of marijuana.
In Knight v. State, 346 So.2d 478 (1977), cert. denied, Ala.,346 So.2d 483, this court held that, if either or both of the two prong tests of Aguilar, supra, are inadequate, the informer's tip may nevertheless be considered in determining existence of probable cause if the tip is verified or corroborated by the officer's own knowledge or observation. This court went on to state that "where the initial impetus for the arrest is on [an] informer's tip, information gathered by the arresting officers can be used to sustain a finding of probable cause; however, the additional information acquired at the time of the arrest must be corroborative of the informer's tip."
In the instant case, the informant's tip was only to the effect that the appellant was coming to Montgomery. The officer's *Page 413 
observation thus corroborated the fact that the appellant did come to Montgomery. Thus, the informant's tip and the officer's verification of that tip fails to provide even a faint glimmer of probable cause that the appellant was committing some crime. Therefore, probable cause would have to arise independently of the nugatory tip provided by the unknown informant in the instant case.
 II
Did probable cause to make a warrantless seizure and search of the appellant arise from the appellant's conduct as observed during the course of Officer Armstrong's surveillance? From reviewing Armstrong's testimony, the answer is obviously no.
In determining whether there is probable cause to arrest, it is not necessary that the officer have before him evidence which would support a conviction for the offense. He need only have facts and circumstances within his knowledge which are reasonably trustworthy and which would lead a prudent man to believe that the accused had committed or was committing an offense. The officer's good faith in making the arrest alone is not sufficient. Braxton v. State, Ala.Cr.App., 350 So.2d 753
(1977).
 "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).
None of the appellant's actions while under surveillance either separately or collectively give rise to probable cause to arrest him. If the appellant's actions were construed to support probable cause, then every visitor to Montgomery would be subject to a warrantless arrest and search for merely driving into town after dark, unloading baggage at an apartment or motel, taking a friend out to dinner, making a telephone call, visiting a lounge and being seen talking to people, and putting their baggage back in the car and leaving town. While officers may have been somewhat suspicious of the appellant's conduct, mere suspicion alone is not enough to negate the warrant requirement of the Fourth Amendment. As stated by Judge Bowen in Knight v. State, supra, at 483: "Arrest on mere suspicion or rumor collides violently with the basic human right of liberty."
 III
During the voir dire examination of Officer Armstrong, the trial judge received an affirmative reply to his question, "Did he [appellant] have a reputation of being a part of the drug culture?" The trial judge therefore ruled that the appellant's reputation, coupled with his actions on the night in question as observed by Officer Armstrong, were sufficient to support probable cause. The facts that an accused had a reputation that he was a bootlegger and that he was arrested entering a dry county from a wet county were held to be an insufficient basis for probable cause to stop and search him. Roberson v. State, supra. In that case, as in this, there was a tip from an unidentified informant which failed to meet either prong of theAguilar test, supra. We held in Roberson and in Hatton v.State, Ala.Cr.App., 359 So.2d 822 (1977), writ quashed, Ala.,359 So.2d 832, that reputation standing alone is an insufficient basis for probable cause, but is a factor which may be considered along with other facts and circumstances in the case in determining the existence of probable cause. However, reputation (normally based upon rank hearsay and community rumor) as an element in determining probable cause should not be given undue weight as was done by the trial judge in the instant case.
In Hatton, supra, we stated that "[w]e recognize that the probable cause in this case represents the bare minimum necessary for a valid search without a warrant." *Page 414 
Yet, in that case the bare minimum included the following facts and circumstances within the officer's knowledge at the time of the search: (1) the informant's tip, (2) the proven reliability of that informant, (3) the sheriff's knowledge of both the informant and the appellant, (4) the reputation of the appellant, and (5) the officer's verification and corroboration of the informant's report. Again, we find in the instant case that the appellant's reputation for being a member of what is nebulously termed "the drug culture" when coupled with the appellant's observed conduct still create no more than a bare suspicion on the part of the arresting officers that the appellant may have been doing something illegal. The facts and circumstances in addition to the appellant's reputation in the instant case fall way short of the bare minimum requirements enunciated in Hatton.
REVERSED AND REMANDED.
All the Judges concur.