WISE, Presiding Judge.
 

 The appellant, Paul Gregory Chambers, was convicted of third-degree burglary, a violation of § 13A-7-7, Ala.Code 1975; second-degree theft of property, a violation of § 13A-8^4(e), Ala.Code 1975; and unlawful possession of a controlled substance, a violation of § 13A-12-212(a)(l), Ala.Code 1975. On January 8, 2008, the trial court sentenced him, as a habitual offender, to serve concurrent terms of 123 months in prison on each conviction.
 
 See
 
 § 13A-5-9(c), Ala.Code 1975. On February 11, 2008, the trial court resentenced him to serve concurrent terms of 15 years in prison and also ordered that he serve them concurrently with his sentences on two previous convictions. Chambers filed a motion for a new trial, which the trial court denied. This appeal followed.
 

 The State presented evidence that, on June 26, 2004, the Medicine Shoppe in Tuscaloosa was burglarized and that quite a bit of its inventory of controlled substances was taken. While they were investigating another crime involving a burglary of Adams Drugs in Montgomery, officers with the Montgomery Police Department recovered some of the stolen controlled substances and traced them back to the Medicine Shoppe. During both investigations, they obtained information that led them to Chambers. Ultimately, Chambers admitted that he dropped Kelly Garner off at the Medicine Shoppe in Tuscaloosa, that Garner burglarized it, and that he picked Garner up afterward.
 

 During the hearing on the motion to suppress, the following occurred:
 

 Corporal Rebecca Sparkman of the Montgomery Police Department testified that she first became aware of Chambers and the fact that he was also known as “Guido” during an investigation of a pharmaceutical burglary at Adams Drugs in Montgomery. Specifically, she testified that, on July 9, 2004, a female confidential
 
 *108
 
 informant in the county jail contacted detectives and wanted to provide information, that she watched the video of the burglary at Adams Drugs, and that she said she thought the person on the video was Guido.
 

 Sparkman testified that, that same afternoon, another confidential informant contacted Detective Paul Hayes, told him Guido was in town, described his vehicle as a tan or yellowish truck, and provided a tag number for the vehicle. The tag was registered to Chambers. They went to hotels to look for the vehicle. Around 2:00 p.m., while they were doing so, the informant telephoned them and advised them that Guido was in a yellow truck and was on his way back to Birmingham. At that point, they advised other law enforcement officers to be on the lookout for Chambers because they wanted to question him.
 

 Sparkman testified that Major J.C. West and Captain Mike Gant got onto Interstate 65 North and located Chambers in Autau-ga County. As they were looking for him, officers found that Chambers had pulled over on the side of the interstate and was out of his truck getting something out of the back of it. She indicated that she thought the location was in Autauga County. They checked his identification, placed him into investigative custody, and took him and his vehicle back to the Montgomery Police Department to question him for safety reasons. Sparkman testified that they performed an inventory search of his vehicle because they have a policy of doing that on a vehicle if they arrest someone or take someone into investigative custody. During that search, they found a crack pipe and a small amount of crack cocaine.
 

 Sparkman testified that, while Chambers was at the police department, she, Sergeant Scott Tatum, and Detective Brad Bartlett talked to him about the burglary at Adams Drugs. She testified that Tatum read from a card and advised Chambers of his Miranda
 
 [1]
 
 rights, that no one threatened or coerced him, that no one promised him it would be better if he made a statement to them, that no one promised him anything in return for making a statement, and that he seemed to understand his rights. She also specifically stated that they did not tell Chambers they would not charge him with possession of the crack and the crack pipe if he talked to them. Sparkman testified that Chambers did not sign a rights waiver, but acknowledged that he understood his rights and was willing to talk to them. They questioned Chambers about the burglary at Adams Drugs, and they determined that he was not the person shown on the video of the burglary.
 

 Sparkman testified that they also questioned Chambers about another case in which he had been mentioned. She explained that, after a Crime Stoppers video of a bank robbery was shown on television, a woman contacted the Montgomery Police Department and stated that she thought Garner was the robber. After investigating, officers found Garner in Kimberly Sullivan’s motel room. During a search of Garner’s vehicle and Sullivan’s purse, officers found pill bottles from the Medicine Shoppe in Tuscaloosa. Sparkman testified that they attempted to question Garner about the burglary of the Medicine Shoppe, but he would not tell them anything. However, she testified that Sullivan told them that Garner would go to Birmingham, meet with someone she knew as Guido, and come back with pills.
 

 Sparkman testified that Chambers stated that Kelly Garner, whom they had arrested on that day, had been in Birming
 
 *109
 
 ham the weekend before and picked him up, that they had driven to Tuscaloosa, and that he had dropped Garner off at a strip mall parking lot. Chambers also stated that Garner telephoned him about ten minutes later to pick him up, that Garner had a brown corduroy duffel bag with him, and that it sounded like pill bottles were in the bag when Gamer put it into the vehicle. Finally, Chambers stated that Garner left him in Birmingham, returned a few days later, and paid him $500.
 

 Sparkman testified that Chambers was in custody, but that they had not arrested him. She also testified that she contacted officials at the Tuscaloosa Police Department to find out if they wanted to speak to Chambers and that they sent officers to talk to him. She further testified that they asked him if there were any other incidents involving Garner and that he told them about two other incidents involving similar facts.
 

 Sergeant A.S. Tatum of the Montgomery Police Department testified that the detective division received information about someone known as Guido on July 9, 2004. During the investigation, they learned that Guido’s real name was Paul Chambers. Chambers was detained and transported to the police department. He stated that Chambers was not under arrest, but was placed in investigative detention.
 

 Tatum testified that he advised Chambers of his
 
 Miranda
 
 rights, that he appeared to understand his rights, and that he agreed to talk to them. He also testified that they did not threaten or coerce him, that they did not tell him it would be better if he made a statement, and that they did not offer him any rewards if he made a statement. Finally, he testified that Chambers was coherent, appeared to know what he was saying and doing, and did not appear to be intoxicated in any form.
 

 Sergeant Alan Kelly of the Tuscaloosa Police Department testified that, on July 9, 2004, he and Investigator Steve Rice went to the Montgomery Police Department and talked to Chambers. He also testified that he read Chambers his
 
 Miranda
 
 rights from a card, that he indicated that he understood his rights, and that he agreed to talk to them. Kelly stated that Chambers was lucid, spoke well, and did not appear to be intoxicated. He also stated that they did not threaten or coerce him, did not tell him it would be better if he made a statement, and did not promise any reward or hope of reward if he made a statement.
 

 Kelly testified that Chambers stated that he and Garner had found the Medicine Shoppe in Tuscaloosa, that Garner got out of the vehicle and said he would telephone him when he wanted him to come back, that Garner got a duffel bag and walked toward the store, and that Garner telephoned him to pick him up 10 or 15 minutes later. Kelly also testified that he wrote down what Chambers said, but Chambers refused to sign the statement. Once they verified that there were not any charges in Montgomery, he and Rice arrested Chambers and transported him to Tuscaloosa.
 

 Kelly testified that, after he got to the county jail, Chambers indicated that he wanted to change what he said. He did not advise Chambers of his
 
 Miranda
 
 rights, but reminded him that they were still in effect. At that time, Chambers stated that he had not been present when Garner committed the burglaries and that he had simply acted as a go-between for selling the drugs. Kelly testified that Chambers also indicated that the officers in Montgomery had been pressuring him
 
 *110
 
 for information, but that he did not believe him.
 

 Chambers testified that, on July 9, 2004, he was traveling on Interstate 65 North in Autauga County and that he pulled over to the side of the road to get something that had fallen onto the floorboard. As he was about to get out of his vehicle, he saw officers behind him pointing guns at him and telling him to get on the ground. He testified that, at that time, he had been smoking crack for about three days. The officers asked his name, which he told them, and they handcuffed him and transported him to the police department.
 

 Chambers testified that Tatum asked him if he knew anything about a burglary at Adams Drugs in Montgomery and that he said he did not. They also asked him about the burglary in Tuscaloosa, and he told them he did not know anything about it. Chambers testified that, when they asked him if he knew Garner, he said that he did and that they had met at a party in Montgomery. He also testified that, when he said he did not know much about Garner, Tatum got really mad, started yelling at him, said he knew he was on parole and asked who his parole officer was, threatened to have a urine screen performed and to contact his parole officer, and threatened to charge him with possession of cocaine.
 

 Chambers stated that he was under the influence of cocaine, that he was terrified by the threats, that he did not have anything to do with the burglary at the Medicine Shoppe in Tuscaloosa, and that he just went along with what the officers were saying. He also stated that Sparkman was not in the room when Tatum yelled at him and threatened him, that she came in after that happened and asked about the burglary of Adams Drugs, and that she looked at a picture and at him and said he was not the person in the picture.
 

 Chambers testified that Tatum and Sparkman questioned him about the burglary in Tuscaloosa and that he said he did not know anything about it. They then got mad and threatened to contact his parole officer. At that point, he told them he overheard Garner talking about breaking into drugstores, but said he did not help him. However, he stated that they continued to pressure him; that he had been up for three days; that he had been smoking crack; that he had not slept or eaten; and that he told them he was involved with Garner to get them off of his back.
 

 Chambers testified that he told Kelly he did not have anything to do with the burglary of the Medicine Shoppe in Tuscaloosa and that he only told the Montgomery officers that because they threatened to charge him with possession of cocaine. He also testified that he refused to sign what Kelly wrote because it was not the truth.
 

 Chambers testified that he did not know and understand what his rights were when he made the statements to Sparkman and Tatum. Specifically, he stated that they never advised him of his rights and that they started bombarding him with questions from the outset. Finally, he testified that he was under the influence of drugs, that the drugs were clouding his judgment, and that he felt like he was being harassed to waive his rights and make a statement.
 

 During a later hearing on the motion to suppress, the following occurred:
 

 Paul Hayes of the Montgomery Police Department testified that, in July 2004, one of his confidential informants advised him that someone identified as Guido was involved in selling prescription drugs. He also testified that the informant had firsthand knowledge about his allegations, that he had used the informant for more than
 
 *111
 
 one year, and that the informant had provided information in multiple state and federal drug cases. Hayes stated that the informant gave him the license plate number for the vehicle Guido normally drove; described the vehicle, which was a yellow or tan Ford truck; and indicated that Guido would probably be traveling north on Interstate 65 to Birmingham.
 

 Hayes testified that another person who he had previously charged and who was in the county jail made contact with the department and indicated that she had heard that Guido had burglarized Adams Drugs. She continued to believe he was the person even after seeing a video. Hayes stated that that was the first time that informant had provided information to him and that he thought she might have provided information to other officers before.
 

 Sparkman testified that, between June 28, 2004, and July 9, 2004, she was conducting an investigation involving Chambers, who was also known as Guido. On June 29, 2004, the Montgomery Police Department received a tip about a possible bank robber and ultimately located Sullivan and Garner, among others, who had possession of pharmaceutical stock bottles. Sullivan told them she had gotten the pills from Garner, who had gone to Birmingham, met with Guido, and brought the pills back.
 

 Sparkman testified that she located the distributor and learned that the bottles had originally been sent to the Medicine Shoppe in Tuscaloosa. She then contacted the Tuscaloosa Police Department and confirmed that the Medicine Shoppe had been burglarized and that pills had been stolen. Finally, she contacted the pharmacist at the Medicine Shoppe, who confirmed that the pills they had recovered were the pills that had been stolen from the Medicine Shoppe.
 

 Sparkman testified that Guido was a person of interest with regard to the pills that were taken from the Medicine Shoppe at that time, which was more than one week before Chambers was taken into custody. She did not know at the time that Guido was a nickname Chambers went by. However, after receiving information about a vehicle that led back to Chambers and taking Chambers into custody, they identified Chambers as Guido.
 

 Sparkman testified that an informant told them that Guido was in Montgomery. The informant contacted them later, said that Guido was getting onto Interstate 65 toward Birmingham, and gave them a description of his vehicle. The license plate number came back to Chambers. Officers were on the lookout for the vehicle, and Lieutenant P.V. Crockett got behind his vehicle on Interstate 65 and kept him in sight. West and Gant were also in pursuit. Chambers pulled over to the side of the road in Autauga County to get something out of the back of the vehicle, and West and Gant pulled up on him.
 

 Sparkman testified that the officers had authority to stop Chambers as a suspect in the burglary of Adams Drugs because they followed him from Montgomery County into Autauga County. However, Crockett was not in a marked vehicle. Therefore, she testified that they contacted state troopers, other local law enforcement officers, and Montgomery officers in an attempt to get any officer who was in a marked law enforcement vehicle to stop Chambers.
 

 Sparkman testified that, at that time, Chambers was a person of interest or a suspect in both the Adams Drugs and Medicine Shoppe burglaries and that they wanted to question him about the two burglaries. She also testified that Detective Chris Grandison, who was investigating the burglary of Adams Drugs, first looked
 
 *112
 
 at Chambers and ruled him out as a suspect based on a store video. Afterward, she, Tatum, and Bartlett told him they wanted to talk to him about the case in Tuscaloosa and about Sullivan and Garner to find out what he knew, and that he agreed to talk to them. However, she stated that Chambers was not under arrest at that time and that he could have left, even though she had previously testified that he was not free to leave.
 

 Lieutenant P.V. Crockett of the Montgomery Police Department testified that, on July 9, 2004, he was one of the officers who was looking for Chambers. He also testified that he first saw Chambers in Montgomery traveling north on Interstate 65, but did not pull him over because he was driving an unmarked, undercover vehicle that did not have blue lights. Crockett testified that he contacted other officers and continued to follow Chambers and keep him in his sight. He also testified that Chambers pulled to the side of the road on his own in Autauga County and got out of his vehicle and that West and Gant pulled in behind him shortly thereafter. Crockett testified that he would have had jurisdiction to pull Chambers over and arrest him even though he was no longer in Montgomery because he had followed him from Montgomery.
 

 Crockett testified that West and Gant approached Chambers, that they did not try to apprehend him or take him down, that they did not draw guns or use force on him, that they did not handcuff him and that Chambers did not try to escape or run. He also testified that, while West was talking to Chambers, Gant pulled a crack pipe and crack cocaine out of his vehicle. At that time, the officers took Chambers into investigative custody for questioning.
 

 Chambers testified that, as he left Montgomery on July 9, 2004, he was not on Interstate 65 until he was in Autauga County. He also testified that he pulled over to get something he had dropped, that officers ordered him to get onto the ground as soon as he tried to get out of his vehicle, that they had their guns drawn on him, and that he complied. Chambers testified that the officers transported him in handcuffs to the Montgomery Police Department, that they did not ask him if he wanted to go to the police department with them to answer questions, and that they did not give him an opportunity to leave. He also testified that, at the police department, Tatum looked at a photograph, looked at him, and indicated that he was not the person in the photograph.
 

 I.
 

 The appellant argues that the trial court erred in denying his suppression motions. Although he raises several arguments in his brief, he essentially filed motions to suppress based on an allegedly illegal stop and improper questioning by the officers.
 

 “ ‘[Conflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.’
 
 Atwell v. State,
 
 594 So.2d 202, 212 (Ala.Cr.App.1991), cert. denied, 594 So.2d 214 (Ala.1992). ‘[A] trial court’s ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.’
 
 Jackson v. State,
 
 589 So.2d 781, 784 (Ala.Cr.App.1991) (citations omitted).”
 

 Rutledge v. State,
 
 651 So.2d 1141, 1144-45 (Ala.Crim.App.1994).
 

 A.
 

 Chambers contends that the trial court should have granted his motions to suppress because law enforcement officers allegedly improperly stopped him. Specif
 
 *113
 
 ically, he asserts that they did not have probable cause to take him into custody for questioning or to arrest him and that they did not have the authority to make a warrantless arrest outside of their police jurisdiction. He therefore alleges that the trial court should have suppressed his statements, which were allegedly the product of an illegal arrest.
 

 “ ‘ “Section 15 — 10—3[ (a) 3(3), Ala. Code 1975, provides that an officer may arrest an individual -without a warrant when a felony has been committed and he has reasonable cause to believe that the individual arrested committed the felony.”
 
 Sockwell v. State,
 
 675 So.2d 4, 13 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). “Reasonable cause has been equated with probable cause.”
 
 Daniels v. State,
 
 534 So.2d 628, 651 (Ala.Crim.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987), opinion after remand, 534 So.2d 658 (Ala.Crim.App.1987), aff'd, 534 So.2d 664 (Ala.1988), cert. denied, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1989). “ ‘The rule of reasonable or probable cause is a “practical, nontechnical conception,” ’ ”
 
 id.,
 
 quoting
 
 Tice v. State,
 
 386 So.2d 1180, 1183 (Ala.Crim.App.), cert. denied, 386 So.2d 1187 (Ala.1980), and “the level of evidence needed for a finding of probable cause is low.”
 
 State v. Johnson,
 
 682 So.2d 385, 387 (Ala.1996). “ ‘ “Probable cause exists where ‘the facts and circumstances within [the arresting officers’] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that’ an offense has been or is being committed.” ’ ”
 
 State v. Johnson,
 
 682 So.2d at 388, quoting
 
 Young v. State,
 
 372 So.2d 409, 410 (Ala.Crim.App.1979), quoting, in turn,
 
 Draper v. United States,
 
 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). Put another way, “probable cause is knowledge of circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty.”
 
 Sockwell,
 
 675 So.2d at 13. “‘An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest].... “Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.” ’ ”
 
 State v. Johnson,
 
 682 So.2d at 387-88, quoting
 
 Stone v. State,
 
 501 So.2d 562, 565 (Ala.Crim.App.1986), overruled on other grounds,
 
 Ex parte Boyd,
 
 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989).
 

 “ ‘ “ ‘In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act....’
 
 Brinegar v. United States,
 
 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1891 (1949). ‘ “The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.” ’
 
 Id.
 
 ‘Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest.’
 
 Cox v. State,
 
 489 So.2d 612 (Ala.Cr.App.1985).”
 

 “
 
 Dixon v. State,
 
 588 So.2d 903, 906 (Ala.1991). See also
 
 Minor v. State,
 
 
 *114
 
 780 So.2d 707, 733 (Ala.Crim.App.1999), rev’d on other grounds, 780 So.2d 796 (Ala.2000); and
 
 McWhorter v. State,
 
 781 So.2d 257, 288 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000). “In making the determination as to whether probable cause exists for a warrantless arrest, we must examine the totality of the circumstances surrounding the arrest.”
 
 Sockwell,
 
 675 So.2d at 13, quoting Daniels, 534 So.2d at 651.’
 

 “Reeves v. State,
 
 807 So.2d 18, 35-36 (Ala.Crim.App.2000).”
 

 Washington v. State,
 
 922 So.2d 145, 159-60 (Ala.Crim.App.2005). Also, with regard to information from confidential informants,
 

 “[t]his court has previously stated:
 

 “ ‘The present test for determining whether an informant’s tip establishes probable cause is the flexible totality-of-the-circumstances test of
 
 Illinois v. Gates,
 
 [462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)]. The two prongs of the test of
 
 Aguilar v. Texas,
 
 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and
 
 Spinelli v. United States,
 
 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), involving informant’s veracity or reliability and his basis of knowledge, “are better understood as relevant considerations in the totality of circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.”
 
 Gates,
 
 [462 U.S. at 223,] 103 S.Ct. at 2329.....Probable cause involves “a practical, common sense decision whether, given all the circumstances, ... including the ‘veracity5 and ‘basis of knowledge’ of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.”
 
 Gates,
 
 [462 U.S. at 238,] 103 S.Ct. at 2332.’
 

 “Pugh v. State,
 
 493 So.2d 388, 392 (Ala.Cr.App.1985), aff'd, 493 So.2d 393 (Ala.1986).
 

 “‘Reference to a confidential informant’s “track record” of past performances is a viable means of determining his credibility.’
 
 Reese v. State,
 
 456 So.2d 341, 349 (Ala.Cr.App.1982), cert. denied, 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983). See also
 
 Moynes v. State,
 
 568 So.2d 392, 393 (Ala.Cr.App.1990);
 
 Carter v. State,
 
 435 So.2d 137, 139 (Ala.Cr.App.1982).... In addition, corroboration supplied by the personal observations of the police officers lends support to the reliability and veracity of the informant. See
 
 Moynes,
 
 568 So.2d 392;
 
 Dale v. State,
 
 466 So.2d 196 (Ala.Cr.App.1985).”
 

 Money v. State,
 
 717 So.2d 38, 42-43 (Ala.Crim.App.1997). Additionally, the State is not required to show that the informant has proven to be reliable any particular number of times.
 
 See Reese v. State,
 
 456 So.2d 341 (Ala.Crim.App.1982).
 

 Further, “ ‘[t]he mere approach and questioning of ... persons [in a parked vehicle] does not constitute a seizure.’ W. LaFave, 3
 
 Search and Seizure
 
 § 9.2(h) (2d ed.1987), and cases cited therein.”
 
 Christmas v. State,
 
 624 So.2d 684, 685 (Ala.Crim.App.1993).
 
 See also Ex parte Betterton,
 
 527 So.2d 747, 749-50 (Ala.1988);
 
 State v. Murray,
 
 733 So.2d 945 (Ala.Crim.App.1999). However, “[i]n
 
 Terry v. Ohio,
 
 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), the United States Supreme Court stated that ‘whenever a police officer accosts an individual and restrains his freedom to walk away, he has “seized” that person.’ ”
 
 State v. Mur
 
 
 *115
 

 ray,
 
 733 So.2d 945, 948 (Ala.Crim.App.1999).
 

 Finally,
 

 “[i]t is well established that
 

 “ ‘a police officer may make a brief investigatory detention based upon a “reasonable suspicion” of criminal activity. This court in
 
 State v. Bodereck,
 
 549 So.2d 542, 545-46 (Ala.Cr.App.1989), quoting from
 
 United States v. Post,
 
 607 F.2d 847, 850 (9th Cir.1979), discussed “reasonable suspicion” as mentioned in
 
 Terry [v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] and stated:
 

 “ ‘ “ ‘[T]he quantum of cause necessary to justify an investigatory stop is a “reasonable” or “founded” suspicion that the person has committed or is about to commit a criminal act.... The founded suspicion must arise from specific facts and not inchoate hunches, but the officer is entitled to draw inferences from those facts
 
 in light of his experience.’
 
 ” ’
 

 “Gaskin v. State,
 
 565 So.2d 675, 677 (Ala.Cr.App.1990) (emphasis added). When evaluating whether reasonable suspicion for a stop exists, we require that the police officer be able to
 

 “ ‘ “point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.
 
 Terry v. Ohio
 
 .... The appropriate question to ask is ‘... [WJould the facts available to the officer at the moment of the seizure or the search “warrant a man of reasonable caution in the belief’ that the aetion taken was appropriate?’.
 
 Terry v. Ohio, ... Daniels v. State,
 
 290 Ala. 316, 276 So.2d 441 (1973).”
 

 “‘Sterling v. State,
 
 421 So.2d 1375, 1379 (Ala.Cr.App.1982).’
 

 “Gaskin,
 
 565 So.2d at 677.
 

 [[Image here]]
 

 “... [T]he law does not require that the appellant be engaged in illegal activity before an officer may make an investigative stop.
 

 “ ‘ “ ‘[T]he relevant inquiry in evaluating the presence of reasonable suspicion is “ ‘not whether particular conduct is “innocent” or “guilty,” but the degree of suspicion that attaches to particular types of non-criminal acts.’ ” ’ ”
 
 State v. Washington,
 
 623 So.2d [392,] 397 [ (Ala.Crim.App.1993) ] (quoting
 
 United States v. Tapia,
 
 912 F.2d 1367, 1370 (11th Cir.1990)) (quoting
 
 United States v. Sokolow,
 
 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989), and
 
 Illinois v. Gates,
 
 462 U.S. 213, 243-44 n. 13, 103 S.Ct. 2317, 2334-35 n. 13, 76 L.Ed.2d 527 (1983)).’
 

 “Hopkins v. State,
 
 661 So.2d 774, 782 (Ala.Cr.App.1994). When reviewing the degree of suspicion that attaches to noncriminal behavior, courts should give great deference to the training and experience of police officers. This court has noted that ‘ “[w]hile many factors which can contribute to a reasonable suspicion of criminal activity are subject to a variety of interpretations, it is the experience of an officer that allows him to bring the factors together into a meaningful whole demonstrating reasonable suspicion of criminal activity.” ’
 
 Id.
 
 at 779 (quoting 2 W. Ringel,
 
 Searches and Seizures, Arrests and Confessions
 
 § 13.4(a) (2d ed.1994)).”
 

 Williams v. State,
 
 716 So.2d 753, 755-56 (Ala.Crim.App.1998).
 

 When it denied the motion to suppress as to the stop, the trial court explained:
 

 “All right. From hearing the evidence, the Court is of the opinion that
 
 *116
 
 there was a seizure of this defendant which was based upon what the Court is of the opinion was reasonable suspicion that he was a — criminal activity on the part of this defendant, so that the seizure was justified or the detention was justified based on the totality of the circumstances.
 

 “What it comes down to is whether or not these officers could make a seizure outside Montgomery County. What has been presented — there has been no case presented to the Court by either party which would — one way or the other regarding the authority to do so. The officers and what the Court gets from the officers’ testimony is that ordinarily they would not have authority to make the seizure, make arrests or otherwise, except when they are in the midst of or in pursuit. And that the undercover person following the defendant in attempting to get a uniformed officer to actually make the stop is how they would explain it. So that that’s the only justification that the Court hears for the seizure of this defendant.
 

 “The Court is of the opinion that, given the totality of the circumstances and all the surrounding factors, including the prior investigation of this defendant or at least the information that the officers had about this defendant’s involvement in Tuscaloosa in the Tuscaloosa burglary, that the detention of the defendant was not unreasonable and that the officers were within their right to detain this defendant and to ultimately question him.
 

 “Therefore the Court is going to deny the motion to suppress.”
 

 (R. 334-36.) The record supports the trial court’s findings, and we adopt them as part of this opinion.
 

 During a separate investigation, officers confirmed that Garner and Sullivan were in possession of controlled substances that had been taken from the Medicine Shoppe. They also received information from Sullivan that connected someone known as Guido to Garner and to the burglary of the Medicine Shoppe. In addition, two confidential informants provided information about someone known as Guido, including the vehicle he was driving, his license plate number, and where he was driving at a particular time. A check indicated that the license plate was registered to Chambers, and officers located Chambers in the vehicle the informant had described on the interstate the informant had mentioned. One of the informants also provided information that might have connected the person known as Guido to a burglary of Adams Drugs in Montgomery. Based on the totality of the circumstances, including information they obtained from witnesses, confidential informants, and their own investigation, the officers had probable cause to detain Chambers for investigatory questioning.
 

 Further, Crockett started pursuing Chambers while he was still in Montgomery and kept him in his line of sight until Chambers stopped, of his own volition, on the side of the road in Autauga County. Although the officers did not stop him, they ultimately detained him and returned him to Montgomery to question him. Even though the officers did detain him in Autauga County rather than in Montgomery, we conclude, as did the trial court, that they had the authority to do so because they followed him from Montgomery and were simply waiting to get a marked vehicle to stop him when he stopped of his own volition.
 
 See
 
 § 15-10-74(c), Ala.Code 1975 (providing that officers in fresh pursuit have authority to make a felony arrest anywhere in the state).
 

 For the reasons set forth herein, including the trial court’s findings based on
 
 *117
 
 disputed facts, we conclude that law enforcement officers had probable cause and authority to detain Chambers in Autauga County and to return him to Montgomery for questioning. Therefore, we do not conclude that the trial court erred in denying his motions to suppress his statements based on any alleged improprieties with the stop.
 

 B.
 

 Chambers also contends that the trial court should have granted his motions to suppress the statements he made to law enforcement officers. Specifically, he asserts that the officers obtained the statements because they improperly detained him longer than was necessary to effectuate the purpose of the stop and because they coerced him to confess by threatening to contact his parole officer, to seek a revocation for using crack cocaine, and to charge him with the possession of the crack cocaine they found in his vehicle.
 

 “It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency.
 
 Bram v. United States,
 
 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In
 
 Culombe,
 
 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his
 
 will has been overborne
 
 ’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence.
 
 Id.
 
 (emphasis added).
 

 “The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’
 
 Boulden v. Holman,
 
 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969);
 
 Greenwald, v. Wisconsin,
 
 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see
 
 Beecher v. Alabama,
 
 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See
 
 Ex parte Matthews,
 
 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992);
 
 Jackson v. State,
 
 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him);
 
 Eakes v. State,
 
 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was
 
 overborne
 
 at the time he confessed’) (emphasis added). Thus, to determine whether McLeod’s confession was improperly induced, we must determine if his will was ‘overborne’ by an implied promise of leniency.
 

 [[Image here]]
 

 “... Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant’s will was overborne by ‘apprehension of harm or hope of favor.’ See
 
 Gaddy,
 
 698 So.2d at 1154 (quoting
 
 Ex parte Weeks,
 
 531 So.2d 643, 644 (Ala.1988));
 
 Culombe,
 
 367 U.S. at 602, 81 S.Ct. at 1879;
 
 Jackson,
 
 562 So.2d at 1380. To determine if a defendant’s will
 
 *118
 
 has been overborne, we must assess ‘the conduct of the law enforcement officials in creating pressure and the suspect’s capacity to resist that pressure’; ‘[t]he defendant’s personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant’s] susceptibility to police pressures.’
 
 Jackson,
 
 562 So.2d at 1380-81 (citations omitted).”
 

 McLeod v. State,
 
 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted).
 

 When it denied the motion to suppress statements, the trial court explained:
 

 “In considering the facts or the evidence in this case, the Court notes a couple of things. Number one, the officer testified that the decision about making the prosecution in Autauga County was left up to Autauga County authorities, which is a perfectly reasonable explanation for the prosecution not taking place.
 

 “But what is of greater concern to the Court is that in order for the Court to conclude that it should suppress the statements, it has to believe the testimony of the defendant in this case. And I have a difficult time believing the defendant’s testimony with him saying that he was not advised of his rights by any law enforcement person in this case. I find that statement to be an indication that his story is simply not believable. I can see him — his capacity being so diminished that he just started talking even though he was advised of his rights. But he didn’t say that. He said I was not told that in no uncertain terms. He repeated it.
 

 “Furthermore, somehow or another he was able to regain his faculties, according to his testimony, sufficiently enough to disavow what he had said earlier and change his story. Now, you would attribute that to him not knowing what he was doing. I would attribute it to him knowing what he was doing.
 

 “So for that reason, because I have — I have doubts about the defendant’s credibility regarding what occurred, the Court is going to deny the motion to suppress the statements.”
 

 (R. 116-18.) The trial court also stated:
 

 “The Court is of the opinion that, given the totality of the circumstances and all the surrounding factors, including the prior investigation of this defendant or at least the information that the officers had about this defendant’s involvement in Tuscaloosa in the Tuscaloosa burglary, that the detention of the defendant was not unreasonable and that the officers were within their right to detain this defendant and to ultimately question him.
 

 “Therefore the Court is going to deny the motion to suppress.”
 

 (R. 335-36.) The record supports the trial court’s findings, and we adopt them as part of this opinion. Based on the conflicting evidence it had before it regarding whether Chambers voluntarily agreed to talk about the Tuscaloosa case and whether the officers threatened him, the trial court could have reasonably chosen to believe the State’s witnesses rather than Chambers. We will not second-guess those credibility choices.
 
 See Rutledge,
 
 supra.
 

 C.
 

 Finally, Chambers contends that the State did not establish the exact
 
 Miranda
 
 warnings that were read to him. However, he presented this specific argument for the first time in his motion for a new trial. Therefore, his objection was not timely, and his argument is not properly before this court.
 
 See Thompson v. State,
 
 611 So.2d 476 (Ala.Crim.App.1992).
 

 
 *119
 
 II.
 

 The State argues that the trial court improperly resentenced Chambers to a greater sentence after it imposed the original sentence in this case. Based on our review of the record, we conclude, for different reasons, that the trial court improperly attempted to resentence Chambers.
 

 On Ja0uary 8, 2008, the trial court sentenced Chambers, as a habitual offender, to serve concurrent terms of 128 months in prison on each conviction.
 
 See
 
 § 13A-5-9(c), Ala.Code 1975. The parties filed a “Joint Motion to Modify Sentence.” On February 11, 2008, the trial court re-sentenced Chambers, as requested, to serve concurrent terms of 15 years in prison and also ordered that he serve them concurrently with his sentences on two previous convictions.
 

 “Pursuant to Rule 24, Ala. R.Crim. P., a defendant may request, and the trial court may order, a modification of his sentence only within 30 days after sentencing.
 
 See Ex parte Hitt,
 
 778 So.2d 159 (Ala.2000).”
 

 Cruitt v. State,
 
 893 So.2d 1236, 1238 (Ala.Crim.App.2003).
 
 See also State v. Monette,
 
 887 So.2d 314, 315 (Ala.Crim.App.2004);
 
 State v. Redmon,
 
 885 So.2d 850 (Ala.Crim.App.2004). Because the trial court entered its order purporting to re-sentence Chambers more than 30 days after it imposed the original sentence, that order was void and must be set aside.
 

 For the above-stated reasons, we affirm Chambers’s convictions. However, we remand this case with instructions that the trial court vacate its order of February 11, 2008, and reinstate the sentences imposed on January 8, 2008. The trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 28 days after the release of this opinion.
 

 AFFIRMED AS TO CONVICTIONS; REMANDED WITH INSTRUCTIONS AS TO SENTENCING
 

 WINDOM and KELLUM, JJ., concur.
 

 WELCH, J., concurs in the result.
 

 [1]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).